## THE FRANCIS PARKMAN.

### SCHLITZKUS v. UNITED STATES et al.

United States District Court
S. D. New York.
Feb. 10, 1948.

Silas B. Axtell, of New York City (Herbert J. Kaplow, of New York City, of counsel), for libellant.

John F. X. McGohey, U. S. Atty., of New York City (Kirlin, Campbell, Hickox & Keating and Walter X. Connor, all of New York City, of counsel), for respondent United States.

Kirlin, Campbell, Hickox & Keating, of New York City (Walter X. Connor, of New York City, of counsel), for respondent McCormick Steamship Co.

CONGER, District Judge.

Action by libellant against respondents as owners and operators of the Steamship "Francis Parkman."

Libellant seeks to recover damages for personal injuries sustained on March 6, 1944, while he was employed on the steamship "Francis Parkman" as an able-bodied seaman. He also asks for maintenance and cure.

The amended libel herein pleads as a first cause of action negligence and unseaworthiness of apparel (first count) and maintenance and cure (second count).

The answer of respondents denies negligence and unseaworthiness and denies that libellant is entitled to maintenance and cure.

There are further set forth in the answer various separate and complete defenses which need not be mentioned except one: Respondents plead and contend that some time after the accident and before the commencement of this action, libellant for a valuable consideration and by an instrument in writing released respondents and the vessel from all liability as to the matters alleged in the libel.

On March 6, 1944, the S.S. "Francis Parkman" was at Majuro, one of the atolls in the Marshall Islands. Cargo was being discharged from the vessel. There had been considerable bombing by the Japs in the area on various atolls, and the Captain of the steamship, being a bit nervous, was having fire and boat drills. At about 10:30 of the day in question, the Master called a boat drill. When it was sounded libellant picked up a life belt and went to his station at No. 3 boat on the starboard aft of the boat deck. Cargo was being discharged on the port side and the vessel had a list to port.

In the meantime, a small boat had been lowered to the water. It happened to be boat No. 3. The Master ordered No. 3 boat crew to get in the boat and take it away. The men left the ship by a debarkation net which was thrown over the side of the ship into the water. This net was about 30 feet long and about 20 feet wide and was made out of rope into a latticed network of squares. The squares were approximately 2½" to 3". Libellant started over the side of the ship. He got on the net and started to descend; he was going down pretty rapidly. When he got down to about 6 to 8 feet he slipped or fell a distance of about 24 feet into the life boat. As a result of the fall, libellant suffered a fracture of the oscalsis bone of the left foot.

After the accident, libellant was taken into a U. S. Navy repair ship where he spent the night. The next day he was transferred to a United States Naval Hospital ship. A cast was put on his foot on March 14. X-rays were also taken at that time. Libellant was then transferred to a Navy aircraft carrier and after 8 days arrived in Honolulu [March 22, 1944]. He remained in Honolulu from March 22 to April 4 and while there he stayed at the Seamen's Institute. On March 29 he was

examined at Honolulu by the United States Public Health Service which gave him a certificate to the effect that he was not fit for sea duties, and that he had a fracture of the left heel and was fit to travel to the mainland.

On or about April 4, libellant's passage to San Francisco was arranged for by respondent's agents. He arrived in San Francisco about April 11. During his stay in San Francisco libellant lived at his sister's home. On or about April 20, libellant went to the office of respondents' steamship company where he made a statement concerning the details of his accident and resultant injuries and later after some negotiations on April 28 signed a release of all his claims for the sum of $1,090.69, which said sum was given by way of a check.

At San Francisco, from April 25 to June 16, libellant received some out-patient treatments at the United States Marine Hospital. Sometime between April 20 and April 28, libellant was examined by respondent's doctor.

The cast was removed from libellant's foot on May 25.

On June 16 the physician at the Marine Hospital certified that libellant was able to travel to New York. Libellant arrived in New York about July 1.

Libellant received out-patient treatments at the United States Marine Hospital at Stapleton, Long Island, from July 1, 1944, to Februray 1, 1945. In all he made five visits to the hospital on the following dates: July 1, July 3, August 4, August 16, 1944, and February 1, 1945.

The records of the Marine Hospital show that on August 16 libellant was fit for duty and that no further treatment was indicated.

Libellant went back to sea sometime in September, 1944, and remained going to sea for about 15 months. At the time of the trial he was working as a bridge maintenance man and bridge structural painter.

Libellant still complains of pain in his heel and says he cannot walk without an arch-support in his shoe.

It appears from the medical testimony that libellant has some permanent disability as the result of his accident which has been estimated at a 10% disability of the left foot. This, however, appears not to be disabling.

The first question to take up is that of the release.

The leading case on the subject is Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 wherein the Court stated:

"* * * that the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding." 317 U.S. at page 248, 63 S.Ct. at page 252.

I think the release in suit conforms to these standards.

Libellant, while he did not have very much formal education, did read and write. On the witness stand, from his answers, I gained the impression that he was quite an intelligent man.

He knew what he was signing and what rights be was releasing.

He testified:

"Q. So that when you signed this paper you understood that in settling you ended every claim you had for damages, compensation, maintenance and cure and wages? A. Yes, I did."

The release itself is printed on a single yellow sheet. At the top in rather large letters is printed in red the following:

"Do not sign this unless you fully understand its contents—this is a full release of all claims and demands."

The release is made clear and unambiguous by the use of red and black type and by filling in blanks with typewriter and pen, and the use of enlarged type in places. The release was made as plain and understandable to one when it was presented for signature as human and legal ingenuity could make it.

At the bottom of the release and right under the line on which libellant signed

his name is the following in fairly large red print:

"Full Release of All Claims"

Underneath that is this sentence:

"Do you understand that signing this paper settles and ends every claim for damages, as well as for compensation, maintenance, cure and wages? answer ———"

Here, after "Answer," libellant wrote "Yes" and signed his name on a line under which was printed in red in large letters:

"Full Release of All Claims"

As to this last question and signature, libellant testified:

"Q. And look at the word 'Yes' which is written in answer to the question: 'Do you understand that the signing of this paper settles and ends every claim for damages as well as for compensation, maintenance and cure and wages?' 'Answer: Yes.'" .

Certainly libellant had full notice of and full knowledge of what he was signing.

The fact that libellant was without a lawyer to counsel him, alone, is not enough to set aside this release in view of all the facts and circumstances disclosed.

Libellant was not hurried by respondents, nor urged to settle. He had 8 days to get a lawyer if he wanted one.

There was no evidence of deception, over-reaching or coercion.

Libellant was aware of the nature and extent of his injuries. He had the opinion of two doctors as to the probable extent of his disability.

The doctor at the Marine Hospital in San Francisco had given libellant an estimate of a probable disability of 6 months from April 25, 1944. Respondents' doctor, who examined libellant before the release was signed, gave libellant about the same estimate, although both doctors told him that it was difficult to say with any degree of certainty how soon libellant could go back to work.

It is interesting to note that libellant admitted when he was examined before trial that respondents' doctor told him that he would be foolish to settle for a thousand dollars.

One cannot say that the amount given to libellant was inadequate. Certainly it was not so inadequate that one can say that libellant was cheated.

I am not unmindful that sailors are wards of the Court and must be protected against their own improvidence. I have scrutinized this transaction with great care and with due regard for the rights of seamen.

But sailors may execute releases which Courts must and should sustain. Judge Clark of the Circuit Court of Appeals of this Circuit in Bonici v. Standard Oil Co. of New Jersey, 103 F.2d 437, 438, wrote on this subject of releases of sailors; his conclusions are most apt here:

"We think the rule to be applied is that which apparently prevails generally as to seamen's releases in admiralty, namely, that such releases are not wholly invalid, but are jealously scrutinized to see that these 'wards of the admiralty' have not been overreached. * * *

"Hence, while 'one who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the burden of sustaining the release as fairly made with and fully comprehended by the seaman' (Harmon v. United States, 5 Cir., 59 F.2d 372, at page 373), nevertheless a release fairly entered into and fairly safeguarding the rights of the seaman should be sustained. Any other result would be no kindness to the seaman, for it would make all settlements dangerous from the employer's standpoint and thus tend to force the seaman more regularly into the courts of admiralty. Even if a seaman is the court's ward, the court cannot be always at hand to watch over him, for it can only move ponderously in a formal lawsuit. Fair settlements are in the interest of the men, as well as of the employers. This conclusion is substantiated by the fact that Congress when it legislated as to one form of releases, namely, those for wages, nevertheless did so on the basis that the release was good until set aside, for it provided that 'any court having jurisdiction may upon good cause shown set aside such release and take such action as justice shall require.'"

In the light of the above I conclude that this release is valid and should be sustained.

In coming to the above conclusion I have heeded Judge Clark's comment on the trial court's finding in the Bonici trial as follows:

"We think, therefore, that the trial court should not have held a seaman's release as always inoperative, but should have considered this release from the standpoint of the fairness of the conditions under which it was secured and of the settlement which it constituted."

While it is not necessary, I feel I should dispose of the other branch of the case that was raised by the first cause of action of negligence and unseaworthiness.

There was some evidence in the case that there was oil in the scuppers in which the debarkation net had been lying and that oil on the net caused libellant to slip. This question of oil, however, has been taken out of the case by libellant himself. He testified as follows:

"Q. So far as you know, there wasn't any oil on this net, was there? From your knowledge, now. A. There had been oil on the net.

"Q. But you were going down and at that time you didn't notice any oil? A. I didn't pay any particular attention.

"Q. You didn't see any oil, did you? A. I didn't notice any.

"Q. And, as a matter of fact, you don't attribute your accident to any oil on the net, do you? A. I do not."

If libellant is to recover he may only do so on the theory that the life jacket libellant was wearing was unseaworthy, not proper for use and that it was negligent for respondents to furnish him with such a life belt.

There apparently are two types of life preservers; a cork jacket and a kapok jacket. The cork jackets are clumsier and more cumbersome than the kapok. Libellant was wearing a cork jacket, which was the only one he said he could find.

The men didn't like the cork jackets for the reasons given above. There was no testimony, however, that the furnishing of one type of jacket or the other was unusual or that it was negligent to furnish one type of jacket or the other or that the cork jacket was an unseaworthy device or appliance.

Libellant contends that after he had started to descend he was forced to lean backward from the net due to the bulky cork life belt and in addition due to the fact the ship was listing to port preventing him from getting the proper grip on the ropes of the net.

This was war. The Japs might come over with their bombs at any time. There might have been a real abandonment of the ship. Speed was of the essence.

I feel that the true explanation of the accident was given by libellant a few days after the accident while he was in the hospital to the purser (Deposition of Raymond C. Wolfe):

"Q. What did he say to you? A. He said he slipped.

"Q. I am sorry. Did you say anything else? A. He was going too fast—

"Q. Wait a minute. Did you say anything else to him other than what you have said just now? A. Not that I recall.

"Q. Now, what did he say to you? A. He says, 'Just one of those things.' He said he always went down the nets like that. * * *"

The release is sustained and the libel dismissed.

I find no cause of action proven of negligence or unseaworthiness [first cause of action].

The second cause of action for maintenance and cure was legally released by libellant.