**Vincent PARODI, Libelant and Cross-Respondent,**

v.

**AMERICAN PRESIDENT LINES, LTD., a corporation, Respondent and Cross-Libelant.**

**No. 29582.**

United States District Court
N. D. California.
June 22, 1967.

Nichols, Rogers & Hamilton, San Francisco, Cal., for libelant.

Lillick, Geary, Wheat, Adams & Charles, San Francisco, Cal., for respondent.

## MEMORANDUM OPINION AND ORDER

GEORGE B. HARRIS, Chief Judge.

Plaintiff, a fifty year old, immigrant seaman of French extraction, filed an admiralty libel in October, 1965, pursuant to the provisions of 46 U.S.C. § 688 et seq. and the principles of General Maritime Law, requesting that this court set aside and declare a legal nullity a document titled "Release of All Claims and Demands," executed on January 31, 1964, between himself and defendant, American President Lines, for a consideration of $3,500, and that he be declared free to litigate his claim for alleged personal injuries encompassed within said release. The defendant filed a cross-libel denying any liability for the alleged injuries and pleading the general release as a bar to the asserted cause of action.

Accordingly, and pursuant to the stipulation of both parties, a court trial was had on the sole and preliminary issue of whether the release is legally vital and binding on the parties so as to effectively estop the plaintiff from proceeding with this suit for damages.

The plaintiff is ostensibly a man of little formal education having terminated his schooling in France at the age of thirteen to follow the sea. He came to this country in 1942 as a member of the crew of a French vessel which was surrendered to the United States. From that time until July, 1964, he sailed aboard various American merchant ships in unskilled ratings.

In October, 1962, plaintiff was employed by the American President Lines to work aboard the SS President Monroe as a wiper. It was during this voyage that he claims he received work-related injuries to his groin and back that form the basis of the release in question. Pursuant to the issuance of an appropriate master's certificate, plaintiff sought medical treatment at the United States Public Health Service Hospital commencing on July 3, 1963, at which time he was marked "not fit for duty" and referred to the surgical clinic with a preliminary diagnosis of a right inguinal hernia. He returned to the clinic on July 12, 1963, also complaining of low back pain. Subsequently, he was operated on for the hernia and marked "fit for duty" in respect thereto, as of September 10, 1963.

On September 20, 1963, he was examined at the Orthopedic Clinic concerning the back pains and marked preliminarily "unfit for duty" pending further examination. That duty status was continued until December 9, 1963, when plaintiff was given a "not fit for duty indefinitely" slip with no return appointment.

Upon receipt of this information, and because of the unique nature of the classification, defendant had plaintiff examined by its own orthopedic surgeon and radiologist who submitted their findings to President Lines in January, 1964. Shortly thereafter, a release was executed, and on February 3, 1964, plaintiff returned to the Public Health Service Hospital where he was marked "fit for duty-no return."

Plaintiff subsequently joined the crew of the SS President Wilson as an engine room maintenance man and worked thereon until July, 1964, when he was repatriated to San Francisco because of another alleged injury to his back. He was treated for this back condition until January, 1965, when he was declared permanently not fit for duty with a diagnosis of a "congenitally weak back, chronic lumbosacral strain." Following, plaintiff was examined by the California State Department of Rehabilitation for possible retraining, with negative results.

■■ From this summary of events, we now turn to the applicable law. The question, being one that affects the rights of a seaman under the Maritime law, is governed by and must be resolved in accord with those principles developed and refined by Federal Courts, which have traditionally and jealously sought to safeguard the rights of seamen who " * * * are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees. * * * If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that *pro tanto* the bargain ought to be set aside as inequitable." Harden v. Gordon, 11 Fed.Cas. No. 6047, at pp. 480, 485.

■■ The burden rests as such upon one who asserts that a seaman has bargained away by way of release his rights to what may be due him, to demonstrate that the release " * * * was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding." Garrett v. Moore-McCormack Co., 317 U.S. 239, 248, 63 S.Ct. 246, 87 L.Ed. 239 (1942).

These controlling pronouncements serve then as the judicial yardstick against which the court must measure the facts as developed by the parties through both oral and documentary evidence so that an accurate and just determination regarding the validity of the release may be reached.

■ Since plaintiff has conceded that no one "at President Lines deliberately defrauded or over-reached" him in regard to the release negotiations (Plaintiff's trial brief, p. 6), and since no evidence was produced at trial to indicate contra, it is concluded that the release was in fact executed voluntarily "without deception or coercion," notwithstanding the suggestion on direct examination that plaintiff was hard pressed financially, at the time he signed the release. (Tr. p. 41) Moreover, any financial pressure which libelant was under at the time of settlement was not known to respondent's representatives.

■ The initial inquiry relates herein to whether plaintiff fully comprehended his rights, the significance of the release, and the claims surrendered by him therein, and by acting alone and without the aid of counsel, " * * * has intelligence enough fully to understand the situation and the risk he takes in giving up the right to prosecute his claim * * *." Sitchon v. Amer. Export Lines, Inc., 113 F.2d 830, 832 (2nd Cir. 1940).

It was brought out during plaintiff's testimony that he was practically unschooled formally; that he had an IQ range of between 78 and 88 placing him intellectually in the dull-normal range; and that he was illiterate, at least in the English language. (Exh. 1, report of Dr. Wolton) Plaintiff further testified as follows:

"Q. Mr. Wilson? All right. Did you believe and understand that you were signing a release for hernia?

"A. That's correct.

"Q. Did you believe or understand that you were signing a release for your back?

"A. No.

"Q. How much money did President Lines give you when you signed that release?

"A. Thirty-five hundred.

"Q. $3,500?

"A. Yes.

"Q. Would you have signed that paper if you believed you were selling your back?

"A. No. (Tr. p. 30)

"The Court: What did you understand when you signed the paper?

"The Witness: I understand I sign this paper only for my release for hernia, because when I sign I ask Mr. Wilson (Watson) was my condition to my back. He told me, 'nothing is wrong with your back,' so I sign, because, like I say, I believe Mr. Wilson (Watson). I am handicap for English. I am very proud myself, too, to be in this country and I have to talk to people." (Tr. p. 31)

The sketch thus drawn by counsel seemingly reveals a seaman who was not able and in fact did not fully comprehend the essence of the bargain he made. Harmon v. United States, 59 F.2d 372 (5th Cir. 1932). The finished portrait, however, depicts quite a different person, one possessed of adequate native ability, and one who had full knowledge and understanding of the situation and of what he was signing. As aptly stated by another Federal court, "He was personally a man of mature years and fair intelligence and from previous experience was not unfamiliar with the subject of releases in settlement of claims for personal injuries * * *." Haddock v. North Atlantic & Gulf SS. Co., 81 F.Supp. 421, 425 (D.C. Md.1948).

The plaintiff's awareness and comprehension was illustrated on the witness stand. He had little difficulty in following questions and understanding their significance. In fact he refused to answer inquiries on cross-examination related to prior injuries and settlement thereof and had to be instructed by his own counsel to so answer. (Tr. p. 75) Furthermore, plaintiff was certainly not a novice at the bargaining table, nor was he unfamiliar with releases. On August 12, 1955, he executed a release with Pacific Far East Lines, Inc., in the amount of $5,500 for head injuries sustained aboard the SS. Fleetwood. On that occasion he was represented by counsel who he declared had explained the meaning of the document to him. (Exh. B)

Again, in 1961, plaintiff had occasion to participate in negotiations, this time with President Lines, for the adjustment of a personal injury claim emanating from his work aboard the SS. President Hayes. In this regard, Mr. Watson, a senior claims adjuster employed by defendant, testified that he suggested settlement to the plaintiff in February, 1961, but that plaintiff was not receptive to discussing the matter because he stated his wrist was still bothering him. (Tr. p. 94) Subsequently, Mr. Vanderwater, another claims adjuster in the employ of President Lines, was approached by plaintiff about settling the claim, in June, 1961. He testified:

"Q. Did you request him to come in or did he come in of his own volition at that time?

"A. No, he came in on his own initiative.

"Q. Was settlement discussed at that time?

"A. Yes.

"Q. And who initiated the discussion?

"A. Mr. Parodi did.

"Q. And in what manner? What did he say to you?

"A. Well, he wanted to know what we would pay in settlement of his claim. He mentioned the possibility of hiring an attorney, but before doing so he would like to know what we would do in that respect.

"Q. Did he give you any specific figure, that is, any specific demand?

"A. Yes.

"Q. And what was that?

"A. He asked for $10,000." (Tr. p. 137, 138)

* * * * * *

"Q. Then when was the next time you had an opportunity to discuss this with Mr. Parodi?

"A. Some time the following month.

"Q. This would be July?

"A. July.

"Q. What transpired at that time, to the best of your recollection?

"A. Well, there was a further discussion of the settlement value of his claim, and he still wanted the $10,000. But a lengthy discussion followed and he came down to nine, I believe, and then to eight, and during the course of the discussion I gave him my ideas that $5,000 would be a reasonable figure, which he rejected out of hand. So after a long period of argument and discussion he finally said that he would settle for $7,000 and that was his final offer on it. * * *" (Tr. pp. 138, 139)

The release (Exhibit C) was later signed for the stated figure of $7,000, on July 28, 1961, some five months after the subject was initially explored by the plaintiff without the assistance and advice of counsel. Mr. Vanderwater testified, however, that he fully explained the release to the plaintiff since he stated he did not read English well, and that afterwards, Mr. Parodi communicated his understanding and acknowledged that he knew what it was. (Tr. pp. 141, 142)

This was the experience then that plaintiff brought with him to the settlement table in January, 1964, when he made a demand to Mr. Watson of $5,000, and the guarantee of a job with President Lines. (Tr. p. 105) In fact, he was so adamant in his position that the negotiations were turned over to Mr. Vanderwater who some two weeks later settled the matter for $3,500, after a lengthy discussion, and who testified that he informed the plaintiff that the release included both the hernia and the back condition. (Tr. p. 157) He further indicated that he again explained the nature of the release to the plaintiff and "that he didn't have to accept the settlement, that he could hire an attorney and sue * * * for damages if he wanted." (Tr. p. 158)

■ The record belies the assertion that plaintiff understood the release to cover only the hernia. He had been marked fit for duty in that regard some four months earlier, but was undergoing continuous treatment for alleged back pains until the time the release was executed. Further, he had in December, 1963, been examined solely for his alleged back condition by defendant's doctors. And that the plaintiff "was without a lawyer to counsel him, alone, is not enough to set aside this release in view of all the facts and circumstances." Schlitzkus v. United States et al., 80 F. Supp. 22, 25 (S.D.N.Y.1948). There was ample opportunity for plaintiff to retain counsel if he so desired since he was not pressed to settle by the defendant, and he was aware of this right. (Tr. p. 76)

Turning to the nature of the medical advice available to him, counsel has attempted to create a legal tempest around the refusal of defendant to give plaintiff a copy of their doctor's report although there is no legal compulsion to do so and even though the medical conclusions were discussed with him, to-wit: "It is our opinion that the patient has no objective evidence of residual permanent disability related to the lumbosacral strain and that he does not require any treatment at this time. He is perfectly capable of returning to his regular occupation." (Exh. D) Consistent with the foregoing medical findings, the plaintiff was informed by the claims adjuster that there was in fact nothing wrong with his back. (Tr. pp. 23, 65, 154, 155)

■ That plaintiff did not have access to his medical records at the U. S. Public Health Service Hospital in accord with its practice is also not controlling, since Vandewater, an adjuster, testified he consulted via telephone with the treating physician, a Dr. Hampton, concerning plaintiff's condition, and based his offer in part upon that conversation. (Tr. pp. 145–151) Moreover, it is the substance of the medical reports that is important and presents the critical question. No contention can be made or asserted that defendant either misled plaintiff or suppressed medical information which should have been made available.

The testimony of Dr. Civello shed further light on the condition of plaintiff at the time the release was executed. He explained various physical tests used in the examination and their significance. With the exception of a sacralized lumbar vertebra, a congenital condition, and minimal arthritic changes involving the vertebrae, there was no evidence of fracture or injury. Of note, however, is the finding of reported anesthesia of both legs below the knees which the doctor stated, " * * * to be in a stocking-glove type of distribution, which in itself is not anatomically possible, and then to have it bilateral and still have normal function, lack of atrophy, totally rules this out as an anatomical or objective finding. This you see very commonly in, oh, if you will, emotional disorders. It's a conversion type of thing." (Tr. p. 250)

In addition, an exhaustive and thorough review of the clinical records of the Public Health Service Hospital (Exh. 6) and the written report of Dr. Civello (Exh. D) demonstrate that the claimed back injury was functional in nature and did not demand greater consideration than that accorded to it by the defendant, at least at the time the release was executed. Plaintiff was diagnosed at the hospital in 1963 as having a chronic lumbosacral strain, but interestingly every examination concluded with negative results. Every form of therapy failed to improve this condition and on December 9, 1963, he was marked "not fit for duty indefinitely, no return" with the notation that plaintiff's nervousness possibly helps to continue the *illness*.

He in fact did not return until some four days after signing the release, on February 3, 1964, at which time he told the doctor "he feels like going to work," and was accordingly marked fit for duty, no return. This rapid recovery was further substantiated by one Jean Allemand, a long-time friend and confidant of plaintiff when he testified that " * * * he (Parodi) tell me he get accident with his back, he was all right, he signed a release and he was going back to sea again." (Tr. p. 89)

The totality of circumstances, including the preceding medical evidence reviewed, the fact that the occurrence of the alleged accident was unsupported by the vessel's records, but rather predicated solely upon the plaintiff's statement to Mr. Watson (Tr. p. 96), compel a determination that liability was tenuous at best regarding the release in question and the consideration paid therefor in the amount of $3500 was adequate and just as related to the hernia and alleged back injury.

Fair settlements are just as much in the interest of the seamen as they are the employers. "Hence, while 'one who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the burden of sustaining the release as fairly made with and fully comprehended by the seaman' (Harmon v. United States, 5 Cir., 59 F. 2d 372, at page 373), nevertheless a release fairly entered into and fairly safeguarding the rights of the seaman should be sustained. Any other result would be no kindness to the seaman, for it would make all settlements dangerous from the employer's standpoint and thus tend to force the seaman more regularly into the courts of admiralty." Bonici v. Standard Oil, 103 F.2d 437 (2nd Cir. 1939), at 438, 439.

The alleged subsequent injury to plaintiff's back aboard the President Wilson in July, 1964 (Tr. pp. 159, 160), has no relationship in fact or in law to the events under examination by this court and certainly could not have been anticipated by the parties at the time the release was executed. Likewise, later developments such as the need for further medical treatment could not have been within contemplation at that time and cannot be used to impeach the integrity of the release.

Accordingly, it is the conclusion of this court that the defendant has dealt equitably with plaintiff in all critical respects, that plaintiff executed the release in accord with the requirements of the *Garrett* decision, supra, and that

the defendant has sustained its burden of proof in respect thereto. As such, the court finds the release to be fair, equitable and just and legally binding on all parties and a bar to any action on the part of plaintiff for injuries arising out of and connected with his service aboard the SS. President Monroe.

Based upon the foregoing findings and conclusions, Rule 52(a) Fed.Rules Civ. Proc., an appropriate judgment may be entered in favor of defendant.